Roberta L. HINOTE, Administratrix of the Estate of Edward T. Hinote, Jr., Deceased, Appellant (Plaintiff Below),

v.

ALUMINUM COMPANY OF AMERICA, Appellee (Defendant Below).

No. 683A198.

Court of Appeals of Indiana, First District.

May 23, 1984.

Rehearing Denied June 25, 1984.

---

Robert O. Williams, Covington, James P. Buchanan, Lebanon, for appellant.

Beardsley & Stengel, Clinton, Robert L. Gowdy, Cox, Zwerner, Gambill & Sullivan, Terre Haute, for appellee.

ROBERTSON, Judge.

Appellant, Roberta L. Hinote, (Administratrix) as Administratrix of the estate of her deceased husband, Edward T. Hinote, Jr. (Decedent) appeals a decision rendered by the Vermillion Circuit Court in favor of appellee, Aluminum Company of America (ALCOA) in a wrongful death action.

We affirm.

On July 21, 1979, Decedent was in a one truck accident near Veedersburg, Indiana, resulting in his death. The day before, he had picked up a load of aluminum coils from the Alcoa facilities in Warrick County. Administratrix filed this wrongful death action alleging that Alcoa was negligent in loading the aluminum coils onto Decedent's truck. She further alleged that this improper loading caused the load to shift while in a curve resulting in Decedent being crushed to death as his truck overturned.

The issue presented by this appeal is whether the trial court committed reversible error by admitting into evidence the results of a blood alcohol test performed on the Decedent at the coroner's request. Administratrix maintains that evidence as to the results of a blood alcohol test obtained from her husband after his death is expressly inadmissible in a civil case pursuant to IND.CODE 9–6–7–1 through 9–6–7–5. In deciding this issue, we must examine the statutes in question together with the evidence presented at trial. Only the evidence and reasonable inferences favorable to the appellee, in this case, Alcoa, may be considered by us on appeal. *Magnavox Ft. Wayne Employee Credit Union v. Benson*, (1975) 165 Ind.App. 155, 331 N.E.2d 46.

Our legislature has recognized the need for information regarding the role of alcohol and other drugs in traffic accidents. As a consequence, I.C. 9–6–7–1 through 9–6–7–5 authorizes the State Department of Toxicology in conjunction with the office of traffic safety to conduct a statistical study regarding the effects of alcohol and other drugs in fatal traffic accidents. In particular, I.C. 9–6–7–4 provides in part:

The director of the state department of toxicology, as herein noted, in conjunction with the department of traffic safety is hereby authorized to require the appropriate agencies to collect the necessary specimens to the maximum extent practicable, from the bodies of all drivers and on all pedestrians fifteen (15) years of age or older who die within four (4) hours after involvement in an accident

. . . .

Among the appropriate state agencies referred to are the Indiana State Police and the Indiana Coroners Association. *See*, I.C. 9–6–7–2. I.C. 9–6–7–3 provides:

The results of any test conducted in the performance of this study are not to be deemed to be a matter of public record ... [S]ince these are the results of a statistical examination, any findings in

any specific instance ... shall not be admissible in evidence in any action of any kind in any court.

We now turn to an examination of the evidence. Robert DeVerter, coroner of Fountain County, testified that he mailed the blood sample to the State Police lab. William Kuhn of the Indiana State Police testified that he received the blood sample and analyzed it. The results of the test showed the Decedent's blood alcohol level at .20 percent at the time of death. Sergeant Kuhn took the blood sample to the Department of Toxicology after he made his test.

We agree with Alcoa in that the evidence presented at trial shows that the tests performed by the Department of Toxicology are separate from the tests performed by the State Police Investigative Division. Furthermore, the statutes show that not only were the tests separate and distinct, but they were both performed for different reasons with different policy considerations in mind.

The sole purpose of I.C. 9–6–7–1 through 9–6–7–5 is that of collecting data for a statistical study. Any individual test result would be of no significance in evaluating the percentage of alcohol and other drug related accidents. Consequently, I.C. 9–6–7–3 excludes from evidence any specific instance or collection of instances in any action of any kind in any court. The anonymity of the individual is preserved and any potential abuse of the data averted.

The test results used at trial were those performed by the State Policy at their Investigative Laboratory. Officer Phillip Oliver testified that whenever the State Police have reason to suspect that an accident may be drug related, they conduct their own investigation as to the cause of the accident and perform their own tests. The coroner received the test results from the State Police lab, not the Department of Toxicology.

■ Thus, the statutes on which Administratrix relies are unrelated to the investigation procedures of the Indiana State Police. As a practical matter, in cases such as this, the blood sample used by the Department of Toxicology and that of the State Police may come from the same vial. However, this practically does not detract from the fact that they are two separate tests performed for two entirely different purposes.

Support for this result is found in other civil cases where the results of blood alcohol tests were admitted into evidence, but did not involve the statutes in question here. For example *Carbon v. Johnson*, (1967) 141 Ind.App. 369, 228 N.E.2d 52 was a negligence case arising out of an automobile accident. The result of a blood analysis was introduced into evidence and showed that at the time of the accident, appellant's decedent had .22 percent alcohol in his blood system. The court held that the administrator of decedent killed in the accident was not denied his constitutional right of due process by the admission into evidence of a blood test even though it was taken after the decedent had died and without the consent of decedent's heirs.

*Orr v. Econo Car of Indianapolis*, (1971) 150 Ind.App. 411, 276 N.E.2d 524 was a wrongful death action. The court held that the decedent's blood alcohol content was admissible without independent evidence that decedent either consumed alcohol or acted as if he was intoxicated. The results of a blood analysis was also admitted in *Physicians Mutual Insurance v. Savage*, (1973) 156 Ind.App. 283, 296 N.E.2d 165. The blood alcohol content at the time of death in this case was .21 percent. However, the court held that this fact alone did not establish that decedent continually and excessively used alcohol so as to invoke the exclusion clause of her accidental death policy.

Even though these cases do not deal with the statutes involved here, they do show that blood alcohol test results have been admitted in civil cases. Clearly, in cases such as the one at bar, the test results are relevant evidence. Where the test results admitted are those performed by the State Police as part of their routine investigation,

the exclusion clause of I.C. 9–6–7–1 *et seq.* is inapplicable. The trial court correctly admitted into evidence the results of the blood alcohol analysis.

■ The next contention of Administratrix is that the admission of the blood alcohol tests violates the physician-patient privilege. She relies on the criminal case of *Alder v. State,* (1958) 239 Ind. 68, 154 N.E.2d 716, which held that a defendant's treating physician could not testify against defendant at his criminal trial for involuntary manslaughter. This case has some rather obvious distinctions from the case at bar. First of all, *Alder* was a criminal case and secondly, the doctor there had been the treating physician, whereas, the doctor here was a pathologist performing an autopsy at the coroner's request.

More on point, is the case of *Mathews v. Rex Health & Accident Insurance Co.,* (1927) 86 Ind.App. 335, 157 N.E. 467. In that case, the court held that a physician employed by the hospital when decedent had been a patient up until his death could not testify as to the results of his autopsy. This was required because the decedent had been a patient of the hospital. However, with respect to autopsies performed by non-treating physicians, the court, quoting from other cases, stated:

> The evidence does not fall within the inhibition of that provision. A dead man is not a 'patient' capable of sustaining the relation of confidence toward his physician which is the foundation of the rule given in the statute .... Moreover, the deceased had not in his life been the patient of Dr. O'Brien.
>
> Neither of the surgeons, so far as he knew, had even seen Carmody during his lifetime .... The relation between a surgeon performing an autopsy and the body of the dead person is not the relation of a physician and patient. (157 N.E. at 468).

The autopsy, in this case, was part of the coroner's investigation pursuant to I.C. 36–

2–14–6. The doctor who performed the autopsy did not "treat" the Decedent so as to invoke the doctor-patient privilege.[1]

■ The last assertion of error is that the results of the analysis were erroneously admitted without having first established a proper "chain of identification". Administratrix maintains that the break occurred because the doctor who drew the blood sample failed to testify to that fact. However, the coroner, Mr. DeVerter, witnessed the doctor draw the blood and did testify to that fact. The evidence establishes the following:

1. The coroner, Mr. DeVerter, was called to the scene of the accident.

2. The body was taken to a funeral home in Veedersburg.

3. The coroner requested an autopsy and a blood sample as part of his investigation. Dr. Heid drew the sample in the coroner's presence while the coroner watched.

4. The blood was placed in a glass vial provided by the State Police for that purpose.

5. On July 21, 1979, the coroner sealed the vial, filled out the appropriate form and mailed the package to the State Police Lab.

6. The State Police Lab received a blood sample identified as coming from the decedent on July 24, 1979.

7. The blood was analyzed at the lab on July 26, 1979.

In a civil case, it is not necessary to show precisely every hand through which the exhibit may have passed. *Orr v. Econo Car of Indianapolis, Inc., supra* 276 N.E.2d at 530. We believe the evidence on this question is sufficient to show a continuous chain of identification. The trial court properly admitted the test results.

Judgment affirmed.

NEAL, P.J., and RATLIFF, J., concur.

---

1. *See also,* IND.CODE 9–11–4–6(c) which abrogates the physician-patient privilege for blood alcohol tests performed in drunk driving cases.

While this is not specifically a drunk driving case, an appropriate analogy can be made which also supports the trial court's decision.